SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
MONICA E. TAIT (Cal. Bar No. 157311)
SCOTT PAETTY(Cal. Bar No. 274719)
Assistant United States Attorneys
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2931/6527
     Facsimile: (213) 894-6269
     E-mail:   Monica.Tait@usdoj.gov/
               Scott.Paetty@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 07-1402-SJO |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION; EXHIBIT |
| v. | Sentencing Date: 11/13/2017 |
| MARK DASH, | Time: 9:00 a.m. |
| Defendant. | Location:   Courtroom of the Hon. S. James Otero |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Monica E. Tait and Scott Paetty, hereby files its sentencing position and response to the presentence report as to defendant Mark Dash.

This sentencing position is based upon the attached memorandum of points and authorities and exhibit, its under seal submission of

victim data, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 26, 2017

Respectfully submitted,

SANDRA R. BROWN
Acting United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

*/s/ Scott Paetty*

MONICA E. TAIT
SCOTT PAETTY
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

Defendant Mark Dash ("defendant" or "DASH") appears for sentencing on his plea to count one, conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 371. The parties and the PSR are in agreement that the offense level for this defendant is 17. The government recommends a 4-level downward Booker variance for this defendant for the reasons stated below, and asks that the court impose a sentence of 12 months' imprisonment, 3 years supervised release, and an order of $460,779.47 in restitution.

**II. FACTS**

Defendant pleaded guilty to one count of conspiracy, in violation of Title 18, United States Code, Section 371. Defendant's conviction is based on his participation in a fraudulent telemarketing operation based in Montreal, Quebec, Canada, that targeted elderly victims in both Canada and the United States. In the plea agreement, defendant agreed to the following statement of facts:

> Beginning as early as 2004, and continuing through December 2006, several individuals agreed to defraud victims in the United States and Canada, including victims located in the Central District of California, and used the U.S. mails and interstate and international wire communications to execute their scheme. Defendant joined the conspiracy no later than 2004 and participated in it through and including approximately September 11, 2006. The conspiracy operated as follows: working from Montreal, Quebec, Canada, defendant's coconspirators committed telemarketing fraud against victims in Canada and the United States, including victims located in the Central District of California. Defendant's coconspirators obtained "leads," that is, names and contact information of potential victims in the United States and Canada. Working from the leads, as defendant then knew, telemarketers contacted victims by telephone and mail and falsely informed them that they had won a large sum of money in a sweepstakes or lottery. As defendant then knew, this representation was false and fraudulent

because there was no sweepstakes or lottery, and the victims called had not won any sum of money from the telemarketers anyone with whom they and the defendant were associated.

As defendant then knew, the telemarketers falsely told the victims that, in order to collect their "winnings," the victims had to pay a sum of money, which the telemarketers falsely represented was for taxes, administrative fees, insurance, legal fees, and other expenses that purportedly had to be paid before the "winnings" could be sent to the victims.  As defendant then knew, these representations were false and fraudulent, as the victims had no reason to send money to the telemarketers, defendant or anyone with whom defendant was associated.

As defendant then knew, the telemarketers would instruct victims to send money in a variety of ways: (i) by wire transfer via Western Union or MoneyGram, either in a name of the victim's choosing, or in a name supplied by the telemarketers; (ii) by mail or by commercial carrier, such as Federal Express, to an address supplied by the telemarketers; or (iii) by wire transfer from the victim's bank account into a bank account controlled by coconspirator John Bellini.

When victims sent money, defendant assisted in arranging for that money to be converted to cash for the benefit of defendant and others, in the following ways, among others: (i) when a victim sent money for the purported expenses and fees by mail or by commercial carrier, such as Federal Express, defendant would receive the funds at his home address, and would provide the remaining funds to Bellini or other co-conspirators; (ii) the telemarketers would instruct victims to wire money through Western Union or MoneyGram, sometimes in defendant's name; defendant, acting as a "runner" for the organization, would then obtain the money from the Western Union or MoneyGram outlets, would take a percentage of the money as a fee, and would supply the remaining money he picked up to coconspirator Bellini.

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendant and others committed the following overt acts:  On September 21, 2005, at the direction of a telemarketer using the name "Jack Gordon," who purported to be with a company called "LKR Enterprises," victim G.J. sent via UPS a check to the home of defendant DASH.

On August 16, 2006, defendant DASH collected money sent via Western Union by victim R.M., in the Central District of California.

On September 11, 2006, defendant DASH attempted to collect money sent via Western Union by victim C.D.

2

> During the time defendant was a member of the conspiracy, more than 10 victims of the conspiracy paid more than $460,000 to the co-conspirators as a result of the fraudulent scheme. The scheme was committed through mass marketing.

(Plea Agreement at pp. 7-9.)

As part of the investigation of this matter, the Royal Canadian Mounted Police ("RCMP") conducted a 6-week wiretap of numerous phones connected to multiple participants in the scheme. Based on the wiretap and RCMP's seizure of search warrant evidence from various defendants, its analysis of Western Union and MoneyGram records, and interviews with certain victims, RCMP linked more than 100 victims to the entire fraud scheme. (Exh. 1 (Victim Summary as of November 21, 2007 by Sgt. Yves Leblanc)). The government has submitted separately, under seal, the underlying data prepared by RCMP in accordance with Sgt. Leblanc's discussion in Exhibit 1, from which the PSR amounts (set forth at PSR p. 18) were derived, itemizing each loss by each victim. See GOVERNMENT'S FILING OF LOSS ANALYSIS LISTING VICTIMS, DATES OF LOSSES, AND AMOUNTS LOST IN CONNECTION WITH SENTENCING, docket no. 589.[1] To compute loss (and restitution) for defendant DASH only, the government has extracted from the under seal data only those victims and only those amounts paid during the time defendant was a member of the conspiracy from 2004 to on or about September 11, 2006. Thus, only the victims and amounts from this timeframe appear in defendant's PSR.

---

[1] To the extent there are differences between Exh. 1 and Docket no. 589 in loss amounts and victim counts, Docket No. 589 controls. Docket no. 589 was filed under seal in connection with defendant Adrien Stephenson's sentencing, but was produced to defendant's counsel in discovery. The victims and transactions on docket no. 589 include transactions and victims for which defendant is not responsible (because they occurred outside of the time defendant was a member of the conspiracy).

3

DASH served as a "runner" for the criminal organization headed by defendant Bellini, and would obtain the money from the Western Union or Money Gram outlets, take a percentage of the money as a fee and would supply the remaining money that he picked up to Bellini. (PSR ¶ 35.) DASH also received money sent from victims at his home address and would provide the remaining funds to Bellini or other co-conspirators. (Id.) DASH did not serve as a telemarketer and did not have contact with the victims of the offense. (Id.) Instead his role was limited to serving as a runner. (Id.) Therefore, as compared to his co-defendants during his period of involvement, DASH appears to have been a minor participant. (Id.) As his plea agreement admits, defendant teamed with telemarketers, and "at the direction of a telemarketer using the name "'Jack Gordon'," one of the victims sent check via UPS to DASH's home; defendant DASH also collected and attempted to collect money sent by victims via Western Union. (Plea Agreement, dkt. 677 at 9.)

**III. SENTENCING GUIDELINES CALCULATIONS**

The parties have agreed that the following calculations, which are consistent with the PSR and the plea agreement's factual basis, apply to this case:

| | | |
|---|---|---|
| Base Offense Level: | 6 | [U.S.S.G. § 2B1.1(a)(2))] |
| Specific Offense Characteristics | | |
| Loss between $250,001 and $550,000 | +12 | [U.S.S.G. § 2B1.1(b)(1)(G)] |
| 10 or more victims, and/or offense committed through mass marketing | +2 | [U.S.S.G. § 2B1.1(b)(2)(A)(i),(ii)] |

4

```
Substantial part of fraud
scheme committed from outside                      [U.S.S.G.
the United States               +2          § 2B1.1(b)(10)(B)]


Adjustments:
Role in Offense                 -2          [U.S.S.G. § 3B1.2(b)]

Acceptance of Responsibility    -3          [U.S.S.G. § 3E1.1]
Total Offense Level             17


Booker/§ 355(a) variance        -4
Adjusted Total Offense Level    13
```

## IV. SENTENCING FACTORS

The government believes that an evaluation of the factors set forth in 18 U.S.C. § 3553(a) demonstrates why a sentence of 12 months is appropriate, reflecting a variance of 4 levels from the advisory guidelines sentence in this matter. The government below addresses the most notable of the § 3553(a) factors as applied to this defendant.

### A. The nature and circumstances of the offense and characteristics of the defendant

Defendant DASH was not on the front lines of the fraudulent organization: he was not a telemarketer who directly lied to victims to persuade them to part with their money. However, DASH was a core member of the conspiracy and was integral to its operation. As the Court well knows, the scheme preyed on the elderly and infirm, causing substantial financial and emotional harm to these elders. The nature of the offense was undeniably serious, and is a substantial factor supporting the recommended sentence.

**B.    The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

A 12-month sentence is appropriate to a person in defendant's role.  As discussed above, defendant did not have contact with victims, although he worked closely with the telemarketers who did have such contact.  A longer sentence would be unjust given defendant's role as a runner; however, defendant should be punished for the more than $460,000 the scheme generated while defendant knowingly participated.

**C.    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

The government's 4-level <u>Booker</u> variance recommendation relates to this factor, due to the history of this specific case.

Defendant is a minor participant, chiefly because he was not in active contact with the victims.  He participated in the scheme at least intermittently for a significant period of time—from 2004 to September 11, 2006.

Previously, this Court has sentenced several of similarly-culpable co-conspirators to custodial sentences of approximately one year:

> -Tania Ivanova, who like defendant DASH, worked as an assistant to defendant Bellini, was associated with slightly more loss (approximately $480,000), and also had no direct contact with victims, received a sentence of 12 months and one day.  (PSR ¶ 11-3.)  Unlike defendant, Ivanova was involved in the scheme for a much shorter period of time (November and December 2006.)

6

-Adrian Stephenson owned a MoneyGram outlet, retrieved the
fraud proceeds from the MoneyGram system, and took a large cut
of the money before remitting the remainder to Bellni.
Stephenson was associated with slightly less loss (approximately
$450,000), and only participated in the scheme for about a
month. He received a sentence of 12-months and one day. (PSR
¶ 11-22.)

A 4-level Booker variance for defendant DASH (effectively, to level 13) would yield an advisory guidelines sentence of 12-18 months, resulting in a similar custodial range to that of defendants Ivanova and Stephenson. The government believes DASH is comparable in culpability to Ivanova and Stephenson, particularly since he shared a similar role in the conspiracy as Ivanova.

Moreover, a 12-month sentence for defendant DASH is about one-third the sentence this Court imposed on telemarketer George Chryssanthopoulos (36 months), and far less than the sentence this Court imposed on the highly culpable telemarketer Jeffrey Jacobson and ringleader Bellini (who received 68- and 87-month sentences, respectively, for their wire fraud convictions).[2] These differences are appropriate given all these defendants' higher (or much higher) levels of culpability, while still providing just punishment for the nature of defendant DASH's offense. Taking in all the sentences

---

[2] As the Court is aware, Bellini's 87-month sentence was a reduced sentence due to his substantial downward departure for cooperation. Similarly, Alexander Andriopoulous, the very first defendant who surrendered even before extradition proceedings, received a similarly substantial departure for his assistance in the case (which was linked to the extradition of all the other defendants) and received probation. For defendant DASH, any sentencing disparity relating to these defendants is warranted, not unwarranted, because defendant DASH did not cooperate. 18 U.S.C. § 3553(a)(6).

imposed so far in this case, a 12-month sentence for this defendant avoids unwarranted sentencing disparity.

### D. Response to Defendant's Sentencing Position

Defendant attempts to mitigate his role in the conspiracy by distinguishing himself from Ivanova. Defendant alleges Ivanova participated in the conspiracy for a longer period than defendant. (See Def's Sentencing Mem. at 6.) This statement is factually incorrect. Defendant acted as a runner for Bellini from at least 2004 through December 2006. (PSR ¶ 13.) As discussed above, Ivanova was only involved from November through December 2006. Therefore, defendant should not be accorded less responsibility than Ivanova for his involvement in the scheme.

Defendant references the fact that he has spent 68 days in custody in Canada prior to his extradition to the United States. (Def's Sentencing Mem. at 2.) The amount of time defendant was in custody in Canada is indicated in the PSR under the heading, "Pretrial Adjustment." (See PSR ¶ 10.) The applicable statute provides as follows:

> (b) Credit for Prior Custody.—A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—
>
> > (1) as a result of the offense for which the sentence was imposed; or
> >
> > (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;
>
> that has not been credited against another sentence.

18 U.S.C. § 3585(b). The government does not dispute the calculation noted in the Pretrial Adjustment, but rather notes that the Bureau of Prisons ("BOP"), not this Court, must decide what credit to award

8

under this statute. <u>United States v. Checchini</u>, 967 F.2d. 348, 349-50 (9th Cir. 1992) (district court has no jurisdiction to grant credit under 18 U.S.C. § 3585(b) (extradition matter)), citing <u>United States v. Wilson</u>, 503 U.S. 329 (1992) (district courts have no jurisdiction to award credit at the time of sentencing). There is no indication that BOP is reluctant to grant credit, will delay granting credit, or has already refused to grant credit to defendant. Moreover, because defendant has not shown that there is any likelihood that he will not be awarded credit by BOP for the time he was detained in Canada as a result of the United States' request to extradite him on the present offense, there is no reason for this court to incorporate a credit calculation in fashioning its sentence.

**V. CONCLUSION**

For the foregoing reasons, the government asks this court to sentence defendant to a term of incarceration of 12 months. In addition, the Court should impose 3 years supervised release, a $100 special assessment, and an order of $460,779.47 in restitution.

Dated: October 26, 2017                    Respectfully submitted,

SANDRA R. BROWN
Acting United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

_/s/ Scott Paetty_____
MONICA E. TAIT
SCOTT PAETTY
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA